UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In the Matter of the Complaint of KINDRA LAKE TOWING, L.P. and BLACK DIAMOND MARINE EQUIPMENT, INC. for exoneration from or limitation of liability. | No. 15 C 3174 |
| ------------------------------------------------------ | Judge Thomas M. Durkin |
| In the Matter of the Complaint of FOUNDATION THEATRE GROUP, INC. for exoneration from or limitation of liability. | |

**MEMORANDUM OPINION AND ORDER**

Kindra Lake Towing, L.P., and Black Diamond Marine Equipment, Inc., bring this action under admiralty law, 46 U.S.C. § 30505, *et seq. See* R. 1. Kindra demise chartered[1] a barge to Black Diamond, which then demise chartered the barge to intervenor Foundation Theatre Group, Inc. Foundation—a theater company that specializes in the production of zombie themed attractions—chartered the barge because it had a contract with Navy Pier, Inc. to produce a haunted house on the barge which would be docked at Navy Pier for Halloween in 2014. The barge sank during a storm while docked at Navy Pier. Kindra and Black Diamond seek a

---

[1] As the Court has noted previously in this case, a demise charter "constitutes the only form of charter that purports to invest temporary powers of ownership in the charterer." *Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 182 (5th Cir. 1981). "A 'demise charterer' [is] one who contracts for the vessel itself and assumes exclusive possession, control, command and navigation thereof [and] is treated as the owner for many purposes[.]" *Matute v. Lloyd Bermuda Lines, Ltd.*, 931 F.2d 231, 235 (3d Cir. 1991). A demise charter is "therefore tantamount to, though just short of, an outright transfer of ownership." *Guzman v. Pichirilo,* 369 U.S. 698, 700 (1962).

declaration that they are not liable for the barge accident. Foundation filed an intervenor complaint seeking a declaration regarding its potential liability. *See* R. 20. Travelers Property Casualty Company and National Union Fire Insurance Company have appeared as subrogees of Kindra and Black Diamond (all together, the "Kindra Parties," and together with Foundation, the "Claimants"). The Kindra Parties and Foundation have also made negligence claims against Navy Pier. R. 50; R. 55.[2] Navy Pier seeks summary judgment on those claims. R. 146; R. 147; R. 148; R. 158. For the following reasons, the summary judgment motions are granted.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[2] Navy Pier has filed its own claims against the Claimants, R. 39; R. 50, but Navy Pier's claims are not at issue on these motions.

Analysis

Navy Pier's only argument on these motions is that it "had no duty to act in this case." R. 158 at 3. The parties agree that Navy Pier's duty in this incident was that of a "wharfinger." "It is well settled that a wharfinger is not the guarantor of the safety of a ship coming to his wharf," but is "under a duty to exercise reasonable diligence to furnish a safe berth and to avoid damage to the vessel." *Trade Banner Line, Inc. v. Caribbean S. S. Co., S.A.*, 521 F.2d 229, 230 (5th Cir. 1975); *see also Schwerman Trucking Co. v. Gartland S.S. Co.*, 496 F.2d 466, 477 (7th Cir. 1974) ("It is well settled that a wharfinger must exercise reasonable care to provide safe facilities for vessels using its docks."). "This includes the duty to ascertain the condition of the berth, to make it safe or warn the ship of any *hidden* hazard or deficiency known to the wharfinger or which, in the exercise of reasonable care and inspection, should be known to him and *not reasonably known* to the shipowner." *Trade Banner*, 521 F.2d at 230 (emphases added); *see also Medomsley Steam Shipping Co. v. Elizabeth River Terminals, Inc.*, 354 F.2d 476, 480 (4th Cir. 1966) (a wharfinger must "warn a ship of any *unexpected* hazard or deficiency known to the wharfinger, or which, in the exercise of reasonable care, he should have known") (emphasis added).

The cases setting forth these principles of a wharfinger's duty primarily concern the duty to warn of hidden underwater obstructions. *See Smith v. Burnett*, 173 U.S. 430, 433 (1899) ("a large rock, sunk in the water, and thereby concealed from sight," of which the wharfinger "had notice of its existence and position . . . and

of its danger to vessels, but neglected to buoy or mark it, or to give any notice to [the plaintiff vessel]"); *Slater Fireproof Storage Co. v. Nicholson Transit Co.*, 47 F.2d 734, 734-35 (7th Cir. 1931) ("several feet below the water there projected beyond the face of the pier . . . rods or bolts . . . causing holes to be made in the [ship's] side, and . . . caus[ing] [it] to sink"; the wharfinger's "failure to make the inspection, and either to remove the obstruction that would have been revealed, or to warn the boat of the danger, was [the wharfinger's] omission, but for which the accident . . . would not have occurred").

By contrast, courts have held that wharfingers *do not* have a duty to warn of ordinary weather conditions because, unlike a rock or bolts hidden under the water but known to the wharfinger, weather conditions are open and obvious and do not require a warning. *See In re Aramark Sports & Entm't Servs., LLC*, 831 F.3d 1264, 1282 (10th Cir. 2016) ("Because most weather conditions are open and obvious, and can be discovered with reasonable diligence, a wharfinger does not have a duty to warn of such dangers." (quoting *West v. City of St. Paul*, 936 P.2d 136, 139 (Alaska 1997))); *Bangor & A. R. Co. v. Ship Fernview*, 455 F. Supp. 1043, 1062 (D. Me. 1978) ("A wharfinger is under no duty to advise an approaching vessel of weather reports at the pier or of other conditions arising during the ordinary course of navigation or docking and which are readily apparent to the ship." (citing *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 800 (5th Cir. 1977))).

The Claimants argue that Navy Pier should have known and warned them about the conditions of the berth on the north side of Navy Pier where Navy Pier

4

required the barge to be docked. The Kindra Parties produced an expert who testified as follows:

> Q: What is it about the selected berth for the [barge] that makes it so apparent that a severe weather contingency plan was necessary?
> A: It's located at the south end of Lake Michigan which gives storms or gales from the northeast an extended fetch with which to develop very large waves. And it's exposed inside the breakwater which is only eight feet high.
> So particularly in that time of year, according to the Coast Pilot, the weather can be quite severe, and so it would be advisable putting a high-profile vessel in that location at that time of year to have a plan to get it out of there, if necessary.
> Q: And you state, again, that would be obvious to anyone with basic maritime experience?
> A: Yes.
> Q: So in other words, an individual with basic maritime experience would not need a particular knowledge of Navy Pier or the surrounding physical structures to make this determination, it's obvious just by looking at it, is that a fair assessment?
> A: Well, it would be a situational decision-making process. If you're going to do a risk assessment, you know, you have to look at the location, the season, the weather potential, the moorings, the vessel, and the ability to evacuate the berth, if necessary.
> Q: Someone sailing up to Navy Pier for the very first time, with basic maritime expertise, would be able to assess that severe weather could be a problem at that location, is that true?
> A: If they read their Coast Pilot, yes.

R. 153-10 at 9 (26:7–27:20).³ The Kindra Parties argue that this testimony "establish[es] a serious breach by [Navy Pier] of its duty to provide a safe berth for

---

³ "The United States Coast Pilot consists of a series of nautical books that cover a variety of information important to navigators of coastal and intracoastal waters and the Great Lakes. Issued in nine volumes, they contain supplemental

5

the . . . barge," because Navy Pier knew or should have known about the danger described by the expert, Navy Pier "had complete control of where the barge would be positioned," and Navy Pier "was well aware" that Foundation was "unfamiliar about the weather." R. 152 at 12-13. Foundation also argues that the berth at Navy Pier was not safe because "there was no fendering to protect the barge and pier," "there were no studies of the weather to be expected," and "there was no contingency plan to move the barge in case of heavy weather." R. 157 at 3.

The Seventh Circuit has twice addressed the duty of a wharfinger in circumstances similar to those present in this case. Both cases concerned accidents that occurred in the outer harbor of the Port of Milwaukee. The Seventh Circuit noted that:

> [t]he Port of Milwaukee has a breakwater, with, of course, a gap in it to allow ships to go in and out of the harbor. Two of the slips in the harbor, where ships berth, are directly opposite the gap in the breakwater. As a result of this geometry, and the occasional violence of Lake Michigan storms, surprising to strangers to the Great Lakes, a northeast gale—and such gales are common on Lake Michigan—can afflict these slips with two severe patterns of wave action, which the parties refer to as "cross-slapping" and "over-topping." Waves from the open water surge through the gap in the breakwater, strike the wall on the other side, recoil, and collide with the next surge, creating a wave twice as high as the other waves stirred up in the harbor by the gale. This is cross-slapping. Over-topping occurs when waves in this area of the harbor become so violent that they spill over the wall of the slip at which a ship is berthed. The concern with

---

information that is difficult to portray on a nautical chart." *See* Website of Office of Coast Survey, www.nauticalcharts.noaa.gov/nsd/cpdownload.htm (last visited Sept. 14, 2017). It is published annually by the National Oceanic and Atmospheric Administration's National Ocean Service.

6

> these unusual conditions is not an academic one. Between 1964 and 1979, nine ships were damaged while berthed in the outer harbor (that is, in the area of the breakwater—there are safer births in an inner harbor). One of them sank. That disaster occurred in 1979, and the ship that sank had been berthed in the slip next to that in which the [ship at issue] became the tenth victim of cross-slapping and over-topping, in 1987. As early as 1951 the city had commissioned a study of wave conditions in the outer harbor that found those conditions to be unsafe. A series of additional studies, the last shortly before the accident that damaged the [ship at issue], confirmed the hazard and recommended measures, such as the construction of a baffle device, that would reduce the violence of the waves in the outer harbor. The city did nothing.

*Bhd. Shipping Co. v. St. Paul Fire & Marine Ins. Co.*, 985 F.2d 323, 327-28 (7th Cir. 1993). Based on these circumstances, the Seventh Circuit reversed the district court's grant of summary judgment to the wharfinger. *See id.* at 330; *see also Cement Div., Nat. Gypsum Co. v. City of Milwaukee*, 915 F.2d 1154, 1156-57 (7th Cir. 1990) (increasing a wharfinger's share of fault in a case where the district court found it "clear from previous claims and from records of wave heights kept by the [wharfinger] . . . that the [wharfinger] had actual knowledge that mooring [at issue] was unsafe during heavy storms," and "failed to warn" the ship's crew).

The Claimants argue that the "facts of the instant case mirror those of the foregoing Seventh Circuit cases [concerning the Port of Milwaukee], and establish a serious breach by [Navy Pier] of its duty to provide a safe berth." R. 152 at 12. But there is no evidence upon which the Court can find that the unusual conditions in the outer harbor of the Port of Milwaukee are at all similar to the conditions at the berth on the north side of Navy Pier at issue in this case. The Seventh Circuit

7

described the wave phenomenon at issue in the Port of Milwaukee cases as "surprising," "unusual," and "severe." By contrast, the Kindra Parties' own expert testified that "someone sailing up to Navy Pier for the very first time, with basic maritime expertise, would be able to assess that severe weather could be a problem at that location," as long as "they read their Coast Pilot." In *National Gypsum*, part of the reason the Seventh Circuit found that the conditions in the Port of Milwaukee created a duty to warn for the wharfinger is that the Coast Pilot "contained no warnings of hazardous wave surges in Milwaukee's outer harbor." 915 F.2d at 1156. Since even the Kindra Parties' expert agrees that the conditions on the north side of Navy Pier where the barge in this case was docked are not "surprising" or "unusual" but are apparent to the average mariner either by sight or by warnings in the Coast Pilot, *Brotherhood Shipping* and *National Gypsum* do not establish that Navy Pier had a duty to warn in this case.

The Claimants contend Navy Pier should have taken a number of actions that could have prevented the accident. They contend that Navy Pier should have studied and had better knowledge of the weather conditions around the pier. They contend that Navy Pier should have had a contingency plan in place to move ships in case of storms. They contend that Navy Pier should have docked the barge on the south side of the pier, rather than the north side, and that Navy Pier should have ensured that the barge was properly tied to the dock and had sufficient fenders. They contend that the Navy Pier should have ensured that its harbor master was sufficiently trained in maritime skills. But all of these contentions presuppose that

Navy Pier had a duty to take any of these actions. None of these conditions suggest a hidden danger that was unaddressed in the Coast Pilot or was not obvious. As discussed, the Claimants have failed to demonstrate any genuine question of fact the answer to which could serve to establish a duty to warn.[4]

The Claimants' focus on Foundation's maritime inexperience also does not serve to establish a duty for Navy Pier where one does not otherwise exist. True, the Seventh Circuit considered the fact that the ship in *Brotherhood Shipping* was foreign to the Port of Milwaukee. But in that case there was sufficient evidence that the wave phenomenon in the outer harbor was *hidden* and sufficiently severe that a duty to warn existed. The Seventh Circuit noted the ship's unfamiliarity with Lake Michigan and the Port of Milwaukee in particular in the context of holding, not that a duty to warn *existed*, but that the Port had *breached* its duty of care by failing to warn. Although a warning might not have been necessary for ships that were familiar with the unusual wave phenomenon in the outer harbor, the fact that the Coast Pilot almanac did not adequately warn of the danger demonstrated that the Port breached its duty by not warning a foreign ship. *See Brotherhood Shipping*, 985 F.2d at 329 (the Port "did not include an explicit warning in the U.S. Costal Pilot . . . [regarding] the bad slips"). Contrary to the Claimants' arguments, the Seventh Circuit did not hold that a duty to warn arises for a wharfinger if the ship in the wharf is controlled by an inexperienced mariner.

---

[4] The Claimants also have not presented any evidence that the need for different fenders was concealed. Rather, the evidence shows that the need for certain fenders was apparent from the construction of the berth. Nor have the Claimants cited any authority to establish that Navy Pier had a duty to provide different fenders.

There is no evidence that the condition of the berth on the north side of Navy Pier was subject to an unexpected or hidden danger. Absent such a latent danger, Navy Pier did not have a duty to warn. *See Trade Banner*, 521 F.2d at 230. And absent such a duty, there can be no liability for Navy Pier under a claim of negligence.

## Conclusion

For the foregoing reasons, Navy Pier's motions for summary judgment, R. 146; R. 147; R. 148; R. 158, are granted, and the Kindra Parties' and Foundation's negligence claims against Navy Pier are dismissed.

ENTERED:

_Thomas M Durkin_
Honorable Thomas M. Durkin
United States District Judge

Dated: September 18, 2017